BUTTE & SUPERIOR COPPER CO. v. CLARK-MONTANA REALTY
CO. et al.

(Circuit Court of Appeals, Ninth Circuit.   February 18, 1918.   Rehearing
Denied April 1, 1918.)

No. 2939.

1. COURTS ⟨═⟩365—FEDERAL COURTS—PRECEDENTS.
   Decisions of the Montana state court as to the validity of mining loca-
   tions are not precedents binding on the federal courts in a suit involving
   the validity of locations in that state made prior to the rendition of such
   decisions of the Montana court.

2. MINES AND MINERALS ⟨═⟩22—LOCATION—VALIDITY.
   Though locator of a mining claim did not comply with the Montana
   statute in force at time, declaring that within 20 days after discovery
   the locator should file for record with the county recorder a declaratory
   statement in writing, verified by oath, describing the location, yet, as the
   statute made no provision for forfeiture for failure to record, the loca-
   tion is valid, though not recorded.

3. MINES AND MINERALS ⟨═⟩44—PATENTS—CONCLUSIVENESS.
   As the action of the Land Department in issuing patents is the judg-
   ment of a special tribunal, not assailable, except by direct proceedings for
   annulment, the invalidity in a mining location is cured by a subsequent
   issuance of a patent.

4. MINES AND MINERALS ⟨═⟩43—LOCATION—CURE OF DEFECTS.
   Rev. Codes Mont. 1907, § 2292, bearing the caption "Validating Locations
   Heretofore Made," and declares that all mining locations made and
   recorded under the laws of the state heretofore in force, that in any
   respect have failed to conform to the requirement of such laws, shall, in
   the absence of the rights of third persons, be valid, if the making and
   recording of such locations conform to the act; while section 2294 de-
   clares that the issuance of United States patent for a mining claim shall
   be deemed conclusive that the requirements of the laws of the state rela-
   tive to location and record of such claims have been duly complied with.
   While the caption was inserted by the compiler of the Codes, yet the
   Codes, after they were framed, were enacted.   Held that, though section
   6213 declares that no part of the Codes is retroactive, unless so expressly
   declared, such sections must be deemed to have a retroactive effect, and
   a failure to comply with the Montana laws as to the recordation of
   locations is cured by subsequent issuance of a patent.

5. MINES AND MINERALS ⟨═⟩44—ISSUANCE OF PATENT—FAILURE TO ADVERSE —
   SURFACE RIGHTS.
   Where a prior locator, who was already extracting ores from his claim,
   did not file any adverse against the application of an adjacent locator
   for a patent, although there was a surface conflict between the two
   claims, the prior locator did not, the patent being issued, lose his priority
   as to extralateral rights, as they could not have been determined in the
   course of the patent proceedings; issuance of the patent affecting only the
   surface.

6. MINES AND MINERALS ⟨═⟩55(2)—QUITCLAIM DEED—OPERATION.
   A quitclaim to an undivided one-fourth interest in a mining claim,
   executed by the owner of an adjacent claim which was first located,
   carries with it only the interest covered by the patent to the claim con-
   veyed, and does not work an estoppel by deed barring the grantor from
   asserting extralateral rights to any vein or ores in his claim extending
   beneath the surface of the claim conveyed.

7. APPEAL AND ERROR ⟨═⟩1011(1)—REVIEW—FINDINGS.
   Findings of fact by the trial court on conflicting testimony are con-
   clusive on appeal.

⟨═⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
   248 F.—39

8. MINES AND MINERALS ⬯38(14)—DISPUTE—BURDEN OF PROOF.

In a suit involving a dispute over extralateral rights asserted by the owners of adjacent mining claims, defendant, whose location was last, has the burden of proving that it has priority throughout its entire depth as to a vein apparently joining one having its apex in complainant's claim.

9. MINES AND MINERALS ⬯38(25)—MINING CLAIMS—ADJUDICATION.

In suit between owners of adjacent mining claims, involving a dispute over extralateral rights, the court properly declined to quiet title to claims resting on an undeveloped or possible junction of veins at great depths beneath the surface.

Appeal from the District Court of the United States for the District of Montana; George M. Bourquin, Judge.

Suit by the Clark-Montana Realty Company, a corporation, and the Elm Orlu Mining Company, a corporation, against the Butte & Superior Copper Company, a corporation. From a decree for complainants (233 Fed. 547), defendant appeals. Affirmed.

W. H. Dickson and A. C. Ellis, Jr., both of Salt Lake City, Utah, Kremer, Sanders & Kremer, J. Bruce Kremer, L. P. Sanders, and Alf C. Kremer, all of Butte, Mont., William Scallon, of Helena, Mont., and Russell G. Schulder, of Salt Lake City, Utah, for appellant.

John P. Gray, of Cœur d' Alene, Idaho, J. L. Templeman and George F. Shelton, both of Butte, Mont., Myron A. Folsom and Rufus Thayer, both of San Francisco, Cal., and W. A. Clark, Jr., of Butte, Mont., for appellees.

Before GILBERT and HUNT, Circuit Judges, and WOLVERTON, District Judge.

GILBERT, Circuit Judge. The Clark-Montana Realty Company, hereinafter called the appellee, as the owner of the Elm Orlu lode mining claim, together with the Elm Orlu Mining Company, its lessee, brought this suit against the appellant, the owner of the Black Rock lode mining claim, to quiet title and to obtain an accounting for ores alleged to have been taken by the appellant from the appellee's mine. The court below, upon the issues and the testimony, found the following facts:

(1) That the Elm Orlu claim was located before the Black Rock claim was located.

(2) That the north wall of the Rainbow vein apex crosses the common side line between said claims 190 feet from the southwest corner of the Black Rock claim, and that the south wall of said vein apex so crosses 301 feet from said corner.

(3) That the Pyle strand of the Rainbow vein diverges from the south side of the latter vein in the Elm Orlu claim, and there and for some indefinite distance easterly has its apex in the Elm Orlu claim.

(4) That the Jersey Blue vein apexes in the Black Rock claim; does not unite with the Rainbow vein, and crosses on strike and dip the Rainbow vein, on strike east of the Rainbow apex crossing of the common side line.

(5) That the Creden vein diverges from the north side of the Rainbow vein in the Elm Orlu claim, and has its apex in both the Elm Orlu and Black Rock claims.

(6) That the apex of the easterly strand of the Rainbow vein in the Black Rock claim terminates at a point within said claim east of the Elm Orlu east end line projected and about 250 feet west of the Black Rock east end line.

---

⬯For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

(7) That, prior to the Black Rock location and patent entry, both the Rainbow vein and the Jersey Blue vein at their apices were discovered and known within the Black Rock claim, and at their apices appeared as a continuous east-west vein.

(8) That each party has mined the ore bodies of the other in the claims involved.

From the findings the court deduced the following conclusions of law:

(1) That plaintiff owns all ore bodies in the Rainbow vein between the Elm Orlu west end line and a parallel line projected from where the south wall apex of said vein crosses the common side line, or about 980 feet of said vein.

(2) That the defendant owns all ore bodies in the Rainbow vein between the projected Elm Orlu end line at the south wall apex crossing of the common side line by said vein and the east end line of the Black Rock claim, or about 1,200 feet of said vein.

(3) That plaintiff owns all ore bodies in the Pyle strand from its divergence at its west end from the Rainbow vein in the Elm Orlu claim easterly as far as the apex of said strand is within said claim, and between Elm Orlu end lines projected, and defendant owns all thereof east of the projected east end line last aforesaid.

(4) That defendant owns all ore bodies in the Jersey Blue vein between the points where the apex departs from defendant's premises across end lines as laid or projected, throughout depth save at its intersection or crossing of the Rainbow vein between Elm Orlu end lines as laid and projected.

(4-2) That plaintiff owns all ore bodies in the Creden vein from its divergence at its east end from the Rainbow vein westerly as far as the Creden apex is within the Elm Orlu claim between Elm Orlu end lines there projected, and defendant owns all thereof west of the projected west end line last aforesaid.

(5) That accounting in damages be had.

The appellant assigns error to the finding of the court below that the Elm Orlu claim was located before the Black Rock claim was located. If the Elm Orlu has priority, the appellee is entitled to all of the Rainbow vein lying between the westerly end line of that claim, and a line parallel thereto running south from a point on the north side of said claim 301 feet easterly from the southwest corner of the Black Rock claim, where as the court found, the foot wall of the Rainbow vein crosses the common side line, and is also entitled to all ores within the intersection spaces of that vein with the Jersey Blue vein and the Creden vein; but, if the Black Rock has priority, then the eastern plane of the appellee's rights in the Rainbow vein would be upon a line parallel to the west line of the claim and running from a point on the north side of the claim 190 feet easterly from the southwest corner of the Black Rock claim, where, as the court found, the northerly wall of the Rainbow crosses the common side line. Discovery and location was made of the Elm Orlu claim on April 18, 1875, and the declaratory statement of the locators was recorded on April 22, 1875, and continuous possession was had by the locators and their successors down to January 1, 1884, the date of the issuance of the patent, for which final entry had been made on February 20, 1882. The Black Rock claim was located November 6, 1875, and the declaratory statement was recorded a week later. Patent was issued on February 15, 1882, final entry having been made on November 24, 1880.

[1, 2] Notwithstanding that the location of the Elm Orlu was prior

in time, the appellant contends that the respective mining rights of the parties hereto are fixed and determined by the dates of the issuance of the patents, and this for the reason that the locators of both the said lode claims failed to comply with the statute of Montana in force in the year 1875, which required that within 20 days after discovery the locator should file for record with the county recorder a declaratory statement in writing on oath before some person authorized by law to administer oaths, describing such location in the manner provided by the laws of the United States; the Supreme Court of Montana having held that declaratory statements substantially in the form of those which were filed by the locators of these two mining claims were void. McBurney v. Berry, 5 Mont. 300, 5 Pac. 867; O'Donnell v. Glenn, 8 Mont. 248, 19 Pac. 302; Hickey v. Anaconda Copper Min. Co., 33 Mont. 46, 81 Pac. 806. It is true that the Montana courts so held, but, in view of the harshness of the rule so established, the Legislature at its session next following the decision in the Hickey Case enacted that the issuance of a patent for a mining claim shall be deemed conclusive that the requirements of the laws of the state relative to location and record have been duly complied with, and it validated all mining locations under the laws of the state "heretofore made that in any respect have failed to conform to the requirements of such laws, except as against one who has located the same ground in good faith and without notice." The court below declined to follow the rule of the Montana decisions, for the reason that the locations of the parties to the present suit had been made prior to the date of those decisions, and they were therefore not binding upon a federal court, and for the further reason that the Montana statute had not provided that failure to record a notice which complied in all respects with the statute of the territory should work a forfeiture of a claim; the court holding that the better rule has always been that, if the recordation law does not expressly provide for a forfeiture for failure to record, the location is valid, though not recorded, citing Last Chance M. Co. v. Bunker Hill & S. M. Co., 131 Fed. 586, 66 C. C. A. 299, and Yosemite Mining Co. v. Emerson, 208 U. S. 25, 28 Sup. Ct. 196, 52 L. Ed. 374. In so holding we think the court below committed no error. Vogel v. Warsing, 146 Fed. 949, 77 C. C. A. 199; Sturtevant v. Vogel, 167 Fed. 448, 93 C. C. A. 84. In the Yosemite Case the question was whether a locator with knowledge of the existence of a mining claim could take advantage of the prior locator's failure to post two notices required by local rules, he having posted but one. The local rule provided for no forfeiture in case of failure to post two notices. The court said:

"To hold that the want of notice under such circumstances would work a forfeiture would be to permit the rule to work gross injustice, and to subvert the very purpose for which it was enacted."

[3] Again, we are of the opinion that if there was invalidity in the original certificate of location of the Elm Orlu lode claim, it was cured by the issuance of the patent. In Steel v. Smelting Co., 106 U. S. 447, 1 Sup. Ct. 389, 27 L. Ed. 226, referring to the powers and functions of the Land Department in issuing patents the court said:

"Necessarily, therefore, it must consider and pass upon the qualifications of the applicant, the acts he has performed to secure the title, the nature of the land, and whether it is of the class which is open to sale. Its judgment upon these matters is that of a special tribunal, and is unassailable, except by direct proceedings for its annulment or limitation."

In Mining Co. v. Tunnel Co., 196 U. S. 337, 25 Sup. Ct. 266, 49 L. Ed. 501, the court, after enumerating the requisite steps for the location of a mining claim, such as discovery, marking the surface boundaries and filing a location certificate within a specified time as prescribed by the Colorado statutes, said that the issuance of a patent in Colorado for a lode claim "is therefore not only a conclusive adjudication of the fact of the discovery of the mineral vein, but also of compliance with these several provisions of its statutes." In Lawson v. United States Mining Co., 207 U. S. 1, 28 Sup. Ct. 15, 52 L. Ed. 65, the locations had been made prior to the Act of July 26, 1866 (14 Stat. 251, c. 262). The court, answering the contention that there was no evidence that the locations were made in conformity to the local customs or rules, said:

"It is sufficient to say that by stipulation of counsel it was agreed that the patents * * * were issued upon the location notices. Inasmuch as they were accepted by the government, and patents issued thereon it was a recognition by the department of the conformity of the proceedings to the local rules and customs of the district, and such ruling is not open to challenge by third parties claiming rights arising subsequently to such notices. * * * Acceptance by the government of location proceedings had before the statute of 1866, and issue of a patent thereon, is evidence that those location proceedings were in accordance with the rules and customs of the local mining district."

So in El Paso Brick Co. v. McKnight, 233 U. S. 250, 34 Sup. Ct. 498, 58 L. Ed. 943, L. R. A. 1915A, 1113, it was held that the entry of the local land officer issuing the final receipt to a locator is in the nature of a judgment in rem, and determines the validity of locations, completion of assessment work, and absence of adverse claims. And in Stewart Mining Co. v. Bourne, 218 Fed. 327, 134 C. C. A. 123, this court held that, where a patent has been issued for a mining claim, a conclusive presumption arises that there is a discovery vein therein, that the claim was properly located thereon, and that all precedent acts necessary to authorize the issuance of the patent had been performed. The earlier decisions of the Supreme Court of Montana were in line with the cases above cited. Butte City Smokehouse Lode Cases, 6 Mont. 397, 12 Pac. 858; Talbott v. King, 6 Mont. 76, 9 Pac. 434; Chambers v. Jones, 17 Mont. 156, 42 Pac. 758. They were overruled, however, in Hickey v. Anaconda Copper Min. Co., 33 Mont. 46, 81 Pac. 806, the court there holding that if the declaratory statement was invalid, a location was not effected, and that in such a case there was no date to which the patent could relate antecedent to the date of the application therefor, which, the court said, was the first intimation to the government that an attempt had been made to locate the claim. The court reasoned that if the locator did not proceed according to law, he initiated no right to which the patent could relate, and observed that of course the government, being the owner, might issue patent upon the showing which Congress saw fit to exact. In brief, the court held that the issuance of the patent was

an adjudication only of compliance with the laws of the United States, and not of compliance with the laws of the state. The case stands alone in so holding. The reverse was held, as we have seen, in Mining Co. v. Tunnel Co., supra.

[4] We think also that any defect in the location of the Elm Orlu claim was cured by provisions of the Revised Codes of Montana of 1907. Section 2294 provides:

"The issuance of United States patent for a mining claim shall be deemed conclusive that the requirements of the laws of this state, relative to location and record of such mining claim, have been duly complied with: Provided, however, that where questions of priority are involved, the date of the location shall be an issuable fact where it is claimed to have been prior to the date of the record of the location."

Section 2292 provides:

"All mining locations, made and recorded under the laws of this state heretofore in force, that in any respect have failed to conform to the requirements of such laws, shall, nevertheless, in the absence of the rights of third persons accruing prior to the passage of this act, be valid if the making and recording of such locations conform to the requirements of this act."

It is urged against the effect of these statutes that they are not retroactive, since section 6213 enacts that no part of the Revised Codes is retroactive unless so expressly declared. Section 2292 has this caption: "Validating Locations Heretofore Made." The appellant points to the fact that the caption to the section was inserted by the compiler of the Codes, and is of no avail as expressing the intention of the lawmakers. The Codes, after they were framed, were enacted, however, as the law of Montana, and even assuming that it was not the intention to make the caption to the section a part of the law, we think the language of the act itself is sufficient to express the intention of the Legislature to make it retroactive. It is expressly made applicable to mining locations that "have failed to conform" to the form and requirements of the laws "heretofore in force." Consolidated Min. Co. v. Struthers, 41 Mont. 565, 111 Pac. 152.

[5] The appellant contends that priority was lost to the Elm Orlu for its failure to adverse the application for the Black Rock patent. At the time when the application for the Black Rock patent was filed, there was surface conflict between a portion of that claim and the Elm Orlu as those claims were marked upon the ground. The application for patent for the Black Rock claim embraced the conflict area, and patent was issued therefor. No adverse claim was filed by the owners of the Elm Orlu. In the application for the Black Rock patent the plat showed only the Black Rock claim, and there was no reference to any conflict between that claim and the Elm Orlu, nor was mention made of the existence of the Elm Orlu claim. The applicants for the Black Rock patent were well aware of the Elm Orlu claim, and knew that it had been located at the time when they made their own location. The notice of intention to apply for patent stated that "the nearest claimants to these premises are claimants to Pollock lode on the southwest." At that time lessees were mining and shipping ore from the Elm Orlu. There was no fence or inclosure of any part of the Black Rock claim, and there was no con-

troversy of any character between the claimants of the two claims. The adjudication of the Land Office was made solely upon the record which was before it, and nothing was determined by the issuance of the Black Rock patent further than the right of the patentees to the surface. Lawson v. United States Mining Co., 207 U. S. 1, 28 Sup. Ct. 15, 52 L. Ed. 65, affirming United States Min. Co. v. Lawson, 134 Fed. 769, 67 C. C. A. 587. The doctrine of the decision in the Lawson Case is that an adjudication by the Land Office of the question of surface rights does not necessarily determine the question of underground rights, and that those rights not being subject to adverse claims, the failure to adverse does not estop the parties to litigate the question of priority. It is thus expressed in Kenney on the Law of the Apex, 233:

"Where the owner of two overlapping claims applies for a patent for one of them and gets it, the patent conclusively determines that the overlapping area was part of such claim at the time of the proceedings. But it does not necessarily determine that the patented claim was located first: and, if it is not shown that that question was put in issue and actually determined in the course of the patent proceedings, the owner of the other claim is not estopped from showing that his claim was really the first located, in a controversy that arises afterwards in regard to extralateral rights which were not, and could not have been determined in the course of the patent proceedings."

The same view of the effect of the Lawson Case is taken in Lindley on Mines (3d Ed.) § 742, and in Costigan on Mining Law, page 396.

[6] The appellant assigns error to the refusal of the court below to hold that the appellee is estopped by deed from asserting title to any vein or ores of the Elm Orlu claim which extend beneath the Black Rock surface. The deed so referred to is a quitclaim executed by the appellee on October 29, 1906, whereby it conveyed to one of the appellant's predecessors in interest, an undivided one-fourth interest in the Black Rock claim, and it is contended that thereby the appellee segregated from the Elm Orlu all mineral rights of that claim bounded by the vertical plane of its north side line, citing Montana Mining Co. v. St. Louis Mining & Milling Co., 204 U. S. 204, 27 Sup. Ct. 254, 51 L. Ed. 444. In the case so cited, in order to settle a dispute between two adjoining mining claims, the owners of one claim deeded to the owners of the other a portion of the former claim described by metes and bounds, "together with all the mineral therein contained." The court held that the effect of the conveyance was not simply to locate a boundary between two mining claims, leaving all surface rights to be determined by the ordinary rules, but that its effect was to convey all mineral below the granted surface, including a vein which apexed in unconveyed land of the grantor, and in so holding recognized the common law of Montana that a deed of real estate conveys all beneath the surface unless there be words of exception or limitation. Here there is no conveyance of a parcel of land described by metes and bounds, but a conveyance of an interest in a mining claim designated by its name. There is no reference in the deed or in the negotiations leading up to its execution to the fact that the grantor owned the adjoining Elm Orlu mining claim, and obviously there was no intention on the part of the grantor to convey, or upon the

part of the grantee to acquire an interest in that claim. In fact, such intention is expressly negatived by the appellant's answer in the present case in which it denied that it claimed any estate or interest adverse to the appellant in or to the Elm Orlu claim, and expressly admitted that the appellee was the owner and in the possession of that claim. There are other circumstances connected with the transaction which might be adverted to, as showing that the intention of the parties was as we have above indicated; but we regard the proposition so plain as to require no discussion that, when the owner of two adjoining mining claims sells and conveys one of them, he conveys only that which is granted by the government when it issues the patent to that claim.

[7] There are several assignments of error to the findings of fact, the principal of which are that the court erred in finding that the Pyle strand of the Rainbow vein diverges from the south side of that vein in the Elm Orlu claim, and there and for some indefinite distance easterly has its apex in the Elm Orlu, and in finding that the apex of the easterly strand of the Rainbow vein in the Black Rock claim does not cross the easterly end of that claim, but terminates at a point within said claim, about 250 feet west of the east end line, and in finding that prior to the Black Rock location, both the Rainbow vein and the Jersey Blue vein at their apices were discovered and known within the Black Rock claim, and appeared as a continuous east-west vein. The appellant does not assert that the findings of fact are unsupported by competent evidence, but contends that they are contrary to the weight of the evidence. The trial court made its findings after an evidently careful and painstaking investigation of the testimony and the exhibits, and after a personal inspection of the mining properties. We have examined the record sufficiently to see that the findings are all supported by the credible testimony of reputable witnesses. Upon settled principles, which this court has always recognized, findings so made upon conflicting testimony are conclusive upon this appeal.

[8, 9] The appellant contends that even though the conclusion is reached that the Elm Orlu claim has priority over the Black Rock, and that the appellee is not estopped by deed to assert title to any ore bodies beneath the surface of the Black Rock, still the court erred in denying to the appellant a decree quieting its title to the Jersey Blue vein through its entire depth, and its title to all ore bodies beneath the surface of the Black Rock claim easterly of a plane parallel to the west end line of the Elm Orlu drawn through a point on the northerly side line thereof 301 feet easterly of the southwest corner of the Black Rock claim, at which point the court found that the Rainbow vein on its foot wall side in its course departed from the Elm Orlu and entered the Black Rock, and this because there was utter failure of proof on the part of the appellee to establish its contention that easterly of such plane there was found within the Elm Orlu claim the apex of any vein or branch of a vein which on its downward course united either with the Jersey Blue vein or with that part of the Rainbow vein, the top of which is conceded to be within the boundaries of the Black Rock extended downward vertically. The contention involves the assumption that the burden was upon the appellee to prove

that there was union upon dip between the Rainbow and the Pyle veins, and the fact that the court failed to fix the point of departure of the apex of the Pyle vein from the Elm Orlu claim. It is true that the court did not determine, but expressly reserved, the question of the point where the apex of the Pyle vein passed out of the Elm Orlu. The evidence was not sufficient to justify a decision of that question. The burden was upon the appellant to show that the apex of the Pyle vein passed through the common side line. Its expert witnesses expressed the opinion that it was possible that it did. One of them said that of two possibilities it was "probably the most probable one." The court below was of the opinion that the proof was clear that the Pyle vein apexed in the Elm Orlu, dipped beneath the Black Rock, and on strike and dip united with the Rainbow, and said:

"Despite diligent, extensive, and costly development work by both parties, the extent of all thereof was indefinite."

And the court reached the conclusion that the appellee owned the Pyle strand or vein in so far as the apex is within the Elm Orlu, and that the appellee owned 980 feet of the Rainbow vein, and that, if the veins unite on dip, the prior location owns all below, the appellee's being the prior location, and the court left to future development the question of how far the Pyle apex continued in the appellee's location, and to what extent beneath the Black Rock it united with the Rainbow in such position as to be controlled by the apex in the Elm Orlu. As to the Jersey Blue vein, one of the issues in the case was whether that vein unites with the Rainbow. It was not only proven, but it was admitted by the appellant, that the Rainbow vein from its apex in the Elm Orlu on its dip extends beneath the Black Rock, and that in said vein is the great ore body in dispute west of the apex crossing of the common side line under both claims, and that it extends downward to unknown depth. There was therefore imposed upon the appellant the burden of proving not only that its claim was prior to the Elm Orlu, but that the Jersey Blue vein unites with the Rainbow vein above any part of the ore body which the appellant claimed. This the appellant failed to show. The court was of the opinion that the alleged union of the veins was doubtful, and that the finding must be that they do not unite, even though the evidence failed to indicate that they cross.

The court below properly declined to quiet title to claims resting on an undeveloped or possible junction at great depths beneath the claim. We think that the court had the power to make the decree which was made on the proven facts, and to leave to future development and proof other rights not yet made certain. Keely v. Ophir Hill Consol. Min. Co., 169 Fed. 601, 95 C. C. A. 99   In Union Pacific Ry. Co. v. Chicago, etc., Ry. Co., 163 U. S. 564, 603, 16 Sup. Ct. 1173, 41 L. Ed. 265, the court approved its decision in Joy v. St. Louis, 138 U. S. 1, 11 Sup. Ct. 243, 34 L. Ed. 843, where it had been said that it was not unusual for a court of equity to take supplemental proceedings to carry out its decree and make it effective under altered circumstances.

The decree is affirmed.